UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARRETT CASE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>RAYTHEL FISHER, JR. et al,<br><br>　　　　Defendants. | No. 1:19-CV-01739-KES-BAM<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>Doc. 41 |

Defendants Raythel Fisher, Harminder Singh Longia, Patricia Johnson, Wei Gu, and Howard E. Moseley move for summary judgment on plaintiff Garrett Case's 42 U.S.C. § 1983 claims. Doc. 41. On September 5, 2024, Case opposed the motion for summary judgment by providing an affidavit and a statement of disputed facts. Doc. 81. Thereafter, Case was granted an extension of time until September 23, 2024, to file any additional legal memoranda in opposition. Doc. 82. Defendants timely filed a reply on October 7, 2024. Doc. 84. Case subsequently filed two documents on November 20 and 26, 2024, to supplement his earlier-filed statement. Docs. 86, 88.[1] For the reasons explained below, defendants' motion for summary judgment is GRANTED.

---

[1] The Court's standing order provides that supplemental briefs and sur-replies shall not be filed without prior leave of court. Case was provided leave to supplement his opposition by September

1

**I.     BACKGROUND AND FACTS**[2]

From March 2018 until February 11, 2020, Case was an inmate incarcerated by the California Department of Corrections and Rehabilitation ("CDCR"), who resided at Valley State Prison ("VSP").[3] Case brings this action under 42 U.S.C. § 1983, alleging that the defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment, and denied him adequate and competent medical treatment by failing to timely approve a CT scan and request for a cervical spine surgery that was recommended by a non-CDCR neurosurgeon, Dr. Senegor, who is not a defendant in this action.[4] Case is not a doctor and has no medical training or education. Case Dep. 79:16–80:5.

The parties agree that the following five defendants acted under color of state law within the meaning of § 1983: Defendant Raythel Fisher was the Warden of VSP during the relevant time. Defendant Howard Moseley was the Associate Director of the Office of Appeals and administered the non-health care-related grievance and appeal process for CDCR. Defendant Harminder Longia was the Chief Physician and Surgeon at VSP. Longia received and processed requests for specialty medical care, including diagnostic imaging, studies, and surgical procedures, from treating providers, but he did not himself provide medical care to Case.

---

23, 2024. Doc. 82. These supplemental filings (Docs. 86, 88) were filed well past that deadline. However, as defendants' briefing refers to certain contents contained within Case's untimely filings, the filings are considered to that extent.

[2] Unless identified below as being in dispute, the facts set out below were confirmed by the parties' pleadings as being not reasonably in dispute for purposes of the present motion.

[3] Case asserts in his opposition to the motion for summary judgment that his claims span his entire incarceration, Doc. 81 at 200, ¶¶ 4–5, however, his First Amended Complaint limits the relevant time period to his incarceration at Valley State Prison, FAC, ¶ 4.

[4] Case's First Amended Complaint ("FAC"), Doc. 29, asserts violations of the First, Fifth, Eighth, Ninth, and Fourteenth Amendments of the Constitution. However, Case has not presented any evidence in support of his claims as to the First, Fifth, Ninth, and Fourteenth Amendments. *See* Doc. 81. Accordingly, the Court considers these claims to be abandoned. *See Momox-Caselis v. Donohue*, 987 F.3d 835, 842 (9th Cir. 2021) (deeming arguments not raised in opposition to summary judgment motion waived); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001) (holding that district court need only consider arguments and facts set forth in motion papers). The discussion below addresses Case's Eighth Amendment claim.

2

Defendant Patricia Johnson is a registered nurse at VSP who provided medical treatment to Case on multiple occasions between March 26, 2018, and September 20, 2019. Defendant Wei Gu is a physician at VSP who provided medical treatment to Case on multiple occasions between July 25, 2018, and January 7, 2019.

Defendants assert that medical staff at individual institutions do not have authority to approve or deny spine-related surgical procedures but must instead submit all requests for such procedures to the Statewide Medical Authorization Review Team ("SMART") Committee at CDCR headquarters in Sacramento, California, which in turn determines whether the proposed surgery is medically indicated and whether the inmate meets the criteria for the surgery. DUF ¶ 8. Case contends defendants submitted false reports to the SMART committee that contradicted Case's symptoms, and that these false reports delayed and "sabotage[d]" Dr. Senegor's recommendation for spine surgery. Doc. 81 at 4, ¶ 8; Doc. 81 at 209, ¶ 31.

**A. Allegations against defendants Johnson, Gu, and Longia**

In 2017, Case filed a claim concerning his spine at Mule Creek State Prison. Doc. 81 at 200, ¶ 5. After transferring to VSP, on April 11, 2018, defendant Johnson met with Case to discuss Case's difficulty swallowing and pain in his left shoulder. At that time, Johnson noted that Case "had osteoarthritis of the cervical spine and severe degenerative disc disease of the lumbar spine," and scheduled Case for a follow-up appointment with a physician, who ordered spinal x-rays. On May 3, 2018, Johnson met with Case to review the results of the x-rays. Part of the plan of care developed at that meeting was to obtain a CT scan of Case's cervical spine and for Case to participate in physical therapy. Case agreed to the CT scan, but declined to participate in physical therapy until the CT scan was completed.[5] On May 8, 2018, Longia cancelled the order for a CT scan and recorded the reason for the cancellation was to review Case's prior imaging studies. Case disagrees that the reason for Longia's cancellation was to review prior

---

[5] Case contends that Johnson did not document all the findings of the prior barium swallow study conducted at San Joaquin General Hospital, which found that Case had "severe reversal of the cervical lordosis." Doc. 81 at 200, ¶ 6. However, Johnson's medical note elsewhere adequately identifies Case's spinal conditions including "[l]oss of cervical lordosis." Doc. 41-6 at 13.

3

imaging studies, noting that he had no prior imaging studies done on his neck. Doc. 81 at 201, ¶ 7.

On May 21, 2018, Johnson again met with Case. DUF at 4, ¶ 12; Doc. 81 at 201, ¶ 8. Johnson asserts she met with Case to discuss his request for a neck brace, but found it was not medically indicated after observing that Case had full range of motion in his head and neck. Johnson Decl. ¶ 11. Johnson notes Case had refused to have x-rays completed the previous week. Doc. 41-6 at 19 (Ex. A to Johnson Decl.). Johnson documents under "Diagnostic Results" that she was "unable to access synapse for prior reported ct of neck no prior CT report in PHIP/CERNA." *Id.* Case asserts the purpose of the appointment was to obtain clarification as to why he had been taken off site for additional x-rays, when the plan had been to obtain a CT scan. Doc. 81 at 201, ¶ 8. Case asserts that he respectfully asked for an explanation for the change in treatment plan and was yelled at to "get out."[6] *Id.*

On July 25, 2018, Case met with defendant Gu for a follow up appointment concerning Case's chronic pain and swallowing issues, and Gu conducted a neurological exam. Case asserts he told Gu that areas of his left hand and fingers were going numb when Gu touched them. Doc. 81 at 202, ¶ 10. Case also reports he requested a CT scan and to see a spine specialist, which was denied. *Id.* Case disputes the results of the neurological exam but offers no medical expert testimony to undermine Gu's findings that there was no objective evidence of numbness nor focal deficit in motor or sensory abilities. DUF at 4, ¶ 13; Gu Decl. ¶ 8; Doc. 41-5 at 11–13 (Ex. A to Gu Decl.). Gu referred Case for an esophagogastroduodenoscopy ("EGD") and for mental health groups to address pain management and ordered a new x-ray of his cervical spine. Gu Decl. ¶ 8. On July 26, 2018, Longia approved Gu's request for an EGD.

On August 16, 2018, Gu met with Case and performed tests to determine arm strength following Case's complaints of numbness. Following the visit, Gu did not recommend a CT scan

---

[6] Johnson's progress note for the visit states that "[t]here were no barriers to effective communication, and effective communication was achieved, even with patient's current status." Doc. 41-6 at 21 (Ex. A to Johnson Decl.). Case also contends that Johnson falsely recorded "[o]perations" in the May 21, 2018 progress note, Doc. 81 at 201, ¶ 9, but the progress note lacks any such notation.

4

or referral to a spine specialist. Case argues that the tests showed clinically significant weakness, but he offers no expert medical testimony to dispute Gu's interpretation of the test results and conclusion that a CT scan or further referral was not warranted at that time. Doc. 81 at 202, ¶ 11; Gu Decl. ¶ 9.

On September 6, 2018, Gu again met with Case concerning his request to see a specialist for his neck and shoulder issues. Gu did not refer Case to a specialist following this meeting, but he confirmed the EGD was scheduled. On physical exam, Gu noted the neck was "Supple. Trachea is in the midline. No evidence of thyromegaly or lymphadenopathy in the cervical area. neck stiff, rom limited due to pain." Doc. 41-5 at 17 (Ex. A to Gu Decl.). Case asserts that he "persistently displayed [his] weakening strength, numbness in [his] left hand, and pain [he] was experiencing in [his] neck and back." Case Decl. ¶ 12.

On September 11, 2018, Case could not complete the scheduled EGD procedure as medical staff were unable to intubate him. Doc. 81 at 37. On September 12, 2018, Gu documented that "pt sent to ECD yesterday, but due to stiffness of neck. Not able to perform egd. recommend to sent to outside EGD." Doc. 41-5 at 19. On September 14, 2018, Longia approved the request for a referral to send Case for an outside EGD. Doc. 41-7 at 11.[7]

On October 2, 2018, Gu met with Case to discuss diabetes medication. Doc. 41-5 at 23. Gu added an addendum to his notes that he noticed Case utilizing his neck while speaking with another person in the yard the same day. *Id.* Case disputes that the conversation Gu noted took place. Case Decl., ¶ 14.

On October 5, 2018, an outside specialist performed an EGD and determined Case had Esophagitis, Grade A, and moderate gastritis. The specialist noted that Case "needs to see Orthopedic Surgeon for his cervical spine arthritis." Doc. 81 at 48–51 (Ex. B to PUF). On October 8, 2018, an interdisciplinary team met with Case and ultimately referred him for a

---

[7] Dr. Gu's progress note from September 24, 2018, reflects that he met with Case to follow up after the first unsuccessful EGD. Doc. 41-5 at 20–21 (Ex. A to Gu Decl.). Case offers no medical expert testimony to rebut Gu's conclusion that referral to a specialist was not medically indicated at that time by Case's symptoms. *Id.*; Gu Decl., ¶ 12; Case Decl., ¶ 13.

1  neurosurgery evaluation.  Doc. 41-5 at 25–26.  Longia approved the referral for a neurosurgery
2  evaluation the same day.  Doc. 41-7 at 15–16.

3        On December 3, 2018, Case was seen by outside neurosurgeon Dr. Senegor, who
4  conducted a physical examination of Case and found that his cervical and lumbar range of motion
5  was less than 50% but that he had good strength in his upper and lower extremities.  Doc. 41-3 at
6  11 (Ex. A to Fernandez Decl.).  He recommended obtaining CT myelograms of Case's cervical
7  and lumbar spine areas.  *Id.*  On December 4, 2018, Case met with Gu and discussed the results of
8  the neurosurgeon visit.  Gu Decl., ¶ 19; Case Decl., ¶ 17.  The recommended CT myelograms
9  were requested by Gu on December 4, 2018, approved by Longia on December 5, and conducted
10 on December 27, 2018.  Gu Decl., ¶ 19; Longia Decl., ¶ 11 & Doc. 41-7 at 17–18; Doc. 41-9 at
11 35.

12       On January 7, 2019, Gu and Case met at the C-yard clinic.  Docs. 41-5 at 41; 81 at 204.
13 On February 7, 2019, Longia met with Case to discuss his complaints concerning medical staff.
14 Docs. 41-7 at 21; 81 at 204–05.  On March 4, 2019, Case was again seen by Dr. Senegor, who
15 discussed the results of the CT scans, performed a physical examination, and recommended
16 surgical intervention on Case's cervical spine.  Doc. 81 at 9–10.  On March 18, 2019, Case met
17 with a VSP physician, Dr. Manasrah, to discuss Dr. Senegor's recommendation and to address
18 Case's concerns about the range of motion in his neck after the surgery.  *Id.* at 10.  Dr. Manasrah
19 referred Case to Dr. Senegor for further explanation of the surgery and alternatives.  *Id.*  On April
20 22, 2019, Case met with Dr. Senegor for further explanation and Dr. Senegor recommended an
21 alternative surgery called a Mobi-C arthroplasty.  *Id.*; Fernandez Decl. at 15–16 (Doc. 41-3).

22       On May 6, 2019, defendant Johnson met with Case.  Johnson Decl., ¶¶ 13–14 & Ex. A at
23 21 (Doc. 41-6); Doc. 81 at 10, 205–06.  Johnson asserts that she discussed with Case the plan to
24 submit a request for approval of the surgery Dr. Senegor recommended.  Doc. 41-6 at 4, 21.
25 Johnson noted that Case appeared to have a full range of motion in his upper and lower
26 extremities.  Johnson Decl., ¶ 14.  Case contends that he displayed clear signs of degradation and
27 deterioration including reduced range of motion in his neck and issues with his left hand, and that
28

6

1  he was unable to walk or sit upright. Doc. 81 at 205–06; Case Dep. 167:13–19, 167:24–168:17
2  (Doc. 41-9 at 46–48).

3  On June 19, 2019, the SMART committee denied the proposed surgery, noting that there
4  was only a limited examination conducted on April 22, 2019 by Dr. Senegor, who indicated that
5  Case's bilateral upper and lower extremity strength was good; that the same exams were done on
6  December 3, 2018, and again on March 4, 2019; and that Dr. Senegor did not identify any impact
7  on Case's ability to independently perform activities of daily living. Doc. 81 at 11; Fernandez
8  Decl. at 21–22 (Doc.41-3). Case asserts that the SMART committee denial was also based on
9  observations by defendant Johnson that Case retained a full range of motion. Doc. 81 at 206.

10  On July 17, 2019, Johnson met with Case again to discuss the SMART committee's denial
11  of the surgery. Doc. 81 at 11, 206. Case states that he was now in a wheelchair full time, and
12  was rapidly losing weight and experiencing neck spasms, and that the fingers on his left hand
13  were numb. *Id.* at 206. Case claims he asked to expedite his return to Dr. Senegor and approval
14  of the surgery. Doc. 81 at 207. Johnson found that Case was not in acute distress, had full range
15  of motion in his upper and lower extremities, and could perform the activities of daily living.
16  Doc. 41-6 at 5, 29. Johnson reports observing Case walk down a hallway without difficulty or
17  any limp while holding his belongings. Doc. 41-6 at 5, 29–30. Johnson ordered Case to begin to
18  use a walker instead of a wheelchair when a walker became available. *Id.* Johnson reports Case
19  did not want to see Dr. Senegor again and instead wanted to see another neurosurgeon. *Id.* at 29.
20  Johnson advised Case he could submit a request to return to Dr. Senegor for a comprehensive
21  examination at a later date. *Id.* at 30. Case disputes that he ever told Johnson that he wanted to
22  see a different provider and asserts the allegation was fabricated. Doc. 81 at 207; *see also* Case
23  Dep. 171:18–172:5; 175:3–176:14.

24  On September 3, 2019, Case met with Johnson again. Docs. 41-6 at 31; 81 at 207. Case
25  asserts that he begged to stop working and asked for an expedited appointment with Dr. Senegor.
26  Doc. 81 at 207. Case reports Johnson acted aggressively, verbally berated him, and threw a
27  privacy screen during the meeting. *Id.* Case asserts that he provided a form 602 grievance
28  detailing the meeting, but Case has not identified any such 602 in the record. *See generally*

1 Doc. 81. Johnson reports that Case's primary concern at the meeting was to obtain a lay-in from his work assignment and the appointment was ended due to Case's "ab[rupt] inapprop[riate] communication." Doc. 41-6 at 6, 31.

On September 20, 2019, Johnson met with Case for a final time. Doc. 81 at 12, 207. Johnson recorded that the complaint on this day concerned a runny nose. Doc. 41-6 at 6, 33. Johnson states they also discussed his request for medical unassignment and a follow up appointment with a neurosurgeon to have the complete examination done. Doc. 41-6 at 6, 34. Johnson also noted that Case had arrived at the infirmary without a cervical collar on, and that Case put the collar on when he went inside for an appointment. *Id.* at 6, 33. Case claims that these notes are false and claims he submitted a 602 grievance form dated September 20, 2019, but no such grievance form is in the record Doc. 81 at 207.

After September 20, 2019, Case did not receive any further medical treatment from defendants Johnson or Gu, and they played no additional role in his medical care. *Id.* at 12.

On October 21, 2019, Case met with Dr. Senegor, who recommended that Case be transferred to the California Health Care Facility ("CHCF") in Stockton, California, and affirmed his recommendation for the proposed cervical spine surgery. Doc. 81 at 13. On November 21, 2019, Longia spoke with Dr. Senegor to discuss the recommendation to transfer to CHCF, and Dr. Senegor stated he documented Case's symptoms and his own clinical exam but agreed to add additional information explaining why the surgery was medically necessary. *Id.*; Longia Decl., ¶ 16 & Doc. 41-6 at 27.

On November 26, 2019, medical staff discussed Dr. Senegor's recommendation, noting "there is a discrepancy between [Case's] complaints (dysphagia, extremity weakness, pain, numbness and tingling), physician exam, and imaging studies." Fernandez Decl., Doc. 41-3 at 20. The team decided to refer Case for a neurological examination to reconcile the differences between Case's self-reported symptoms, imaging, and physical exam findings before resubmitting the request for surgery to the SMART committee. *Id.*

On December 17, 2019, Case met with CDCR physician Dr. Torres to discuss the committee's recommendation for neurology. Dr. Torres and Case disagree regarding whether

8

Case refused to see a neurologist. Fernandez Decl. at 3–5; Doc. 81 at 208; Case Dep. 197:20–199:23.

On December 20, 2019, Dr. Torres completed an outpatient progress note, noting a SMART committee update. Doc. 41-3 at 3. Dr. Torres noted that the request for cervical spine surgery was denied again based on discrepancies in physical exam findings and ordered a CT scan and nerve conduction study. On February 11, 2020, Case was transferred to CHCF, and defendants Johnson, Gu, and Longia did not have any further contact with Case. *See* Gu Decl. ¶ 23; Johnson Decl. ¶ 22; Kuchinsky Decl. & Ex. A at 59:19–20.

Case saw several other non-party specialists in February and March 2020, including a non-CDCR neurologist and a psychiatrist, and had an electromyography ("EMG") study done on January 22, 2021. Doc. 41-9 at 65. The EMG study showed injuries that required an additional exam by another neurologist later in 2021, at which point neurosurgery was recommended by the neurologist and then approved by the SMART committee.[8] *Id* at 66.

**B. Allegations against defendants Moseley and Fisher**

The undisputed record shows that Defendant Moseley is not a doctor, holds no medical licenses, is not qualified to make any medical treatment decisions, and does not have any authority to order any medical staff to provide specific treatment. Doc. 81 at 15, ¶41. Moseley also does not handle any healthcare related appeals or grievances for any inmate, and he never reviewed or denied any such grievances from Case. *Id.* at ¶ 42.

Defendant Fisher, a retired warden, is also not a doctor, has no medical training, was not qualified to make medical treatment decisions on behalf of any inmate, and did not have the

---

[8] Case directs the Court to his untimely filing for the results of the off-site neurological exam. Doc. 86 at 10. Defendants' expert also refers to these subsequent neurological assessments. Kuchinsky Decl, Doc. 41-9 at 65. A non-CDCR neurologist, Dr. Saremi, saw Case on February 6, 2020 toward the end of his time at VSP and shortly before his final visit with defendant Gu. Dr. Saremi concurred in Dr. Senegor's assessment: "At this point, [Case's cervical] condition should be addressed by neurosurgeon. . . ." Doc. 86 at 10. Defendants' expert refers to this second opinion by Dr. Saremi in his report. Following Dr. Saremi's recommendation, Case was referred to another neurologist in 2021 "who provided a more detailed neurological exam than Dr. Saremi's and recommended follow up with neurosurgery." Doc. 41-9 at 66. Case's cervical surgery was then approved. *Id.* Dr. Senegor performed the neurosurgery on July 29, 2021. *See* Doc. 81 at 67.

9

authority to order CDCR medical staff to provide any specific medical treatment. Doc. 41-4 at 2, ¶ 5. Fisher did not have any authority over or personal involvement in providing or making decisions related to medical care for the inmates at VSP, did not personally investigate inmate medical appeals or grievances, and was not privy to inmate medical information. *Id.* ¶ 3. Any inmate medical inquiries or correspondence received by Fisher's office were forwarded to the Chief Executive Officer at VSP for appropriate action. *Id.* ¶ 4. Fisher did not personally review or respond to any letters regarding Case's medical care, and he had no involvement in the decision to deny the request for surgery. *Id.* ¶ 8.

## II. LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light most favorable to the nonmoving party and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party meets its initial burden, the burden shifts to the nonmoving party to produce evidence supporting its claims or defenses and "establish that there is a genuine issue of material fact." *Matsushita*, 475 U.S. at 585. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586 (citation omitted).

1  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position" is
2  insufficient to survive summary judgment. *Anderson*, 477 U.S. at 252.

3  In the endeavor to establish the existence of a factual dispute, the nonmoving party need
4  not establish a material issue of fact conclusively in its favor. *T.W. Elec. Serv., Inc. v. Pac. Elec.*
5  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). It is sufficient that "the claimed factual
6  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at
7  trial." *Anderson*, 477 U.S. at 249 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.
8  253, 289 (1968)).

9  All reasonable inferences that may be drawn from the facts placed before the court must
10 be drawn in favor of the opposing party. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at
11 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's
12 obligation to produce a factual predicate from which the inference may be drawn. *See Richards*
13 *v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902
14 (9th Cir. 1987). In addition, while a verified complaint may be considered as evidence at the
15 summary judgment stage "if it is based on personal knowledge and if it sets forth the requisite
16 facts with specificity," *Lopez v. Smith*, 203 F.3d 1122, 1132 n. 14 (9th Cir. 2000) (en banc), an
17 unverified complaint cannot be considered as evidence. *Moran v. Selig*, 447 F.3d 748, 759-60
18 (9th Cir. 2006) (citing *Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10–11 (9th Cir. 1995);
19 *Lew v. Kona Hospital*, 754 F.2d 1420, 1423-24 (9th Cir. 1985)).

20 "If the nonmoving party fails to produce enough evidence to create a genuine issue of
21 material fact, the moving party wins the motion for summary judgment. But if the nonmoving
22 party produces enough evidence to create a genuine issue of material fact, the nonmoving party
23 defeats the motion." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099,
24 1103 (9th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

25 **III.    DISCUSSION**

26 Defendants' motion for summary judgment divides the defendants into two groups with
27 separate theories offered as the basis for summary judgment. *See* Doc. 41-1 at 10, 19.
28 Defendants argue Fisher and Moseley are not liable on the grounds of supervisor liability and, in

1    the alternative, are entitled to qualified immunity. *Id.* at 25–27.  Defendants also argue that all
2    defendants are entitled to qualified immunity because none of them hold the power to approve or
3    deny requests for spinal surgeries and because it is not clearly established by law that a referral
4    and review process for a specialized review of medical necessity is a violation of constitutional
5    rights.  *Id.* at 30.  Defendants further argue that the record establishes that Gu, Johnson, and
6    Longia were not deliberately indifferent in their treatment of Case.  *Id.* at 16.  Because whether
7    the officer's conduct violated a constitutional right is a component of the qualified immunity
8    analysis, the Court proceeds directly to consideration of qualified immunity.

9    Qualified immunity shields "government officials 'from liability for civil damages insofar
10   as their conduct does not violate clearly established statutory or constitutional rights of which a
11   reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting
12   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "balances two important interests
13   – the need to hold public officials accountable when they exercise power irresponsibly and the
14   need to shield officials from harassment, distraction, and liability when they perform their duties
15   reasonably."  *Id.*  An officer may be denied qualified immunity only if "(1) the [evidence], taken
16   in the light most favorable to the party asserting injury, show[s] that the officer's conduct violated
17   a constitutional right, and (2) the right at issue was clearly established at the time of the incident
18   such that a reasonable officer would have understood her conduct to be unlawful in that
19   situation."  *Calonge v. City of San Jose*, 104 F.4th 39, 44 (9th Cir. 2024) (quoting *Torres v. City*
20   *of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011)).  Courts are "permitted to exercise their sound
21   discretion in deciding which of the two prongs of the qualified immunity analysis should be
22   addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at
23   236.  The Court first addresses whether defendants violated Case's constitutional rights.

24   **A. Eighth Amendment Deliberate Indifference to Serious Medical Needs**

25   The Eighth Amendment prohibits "cruel and unusual punishments."  *Farmer v. Brennan*,
26   511 U.S. 825, 832 (1994).  Where a prisoner's Eighth Amendment claims arise in the context of
27   medical care, the prisoner must allege and prove "acts or omissions sufficiently harmful to
28   evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106

(1976). An Eighth Amendment claim has two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1991), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 113 (9th Cir. 1997) (en banc).

A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). To act with deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. A defendant is liable if he or she knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847. "It is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm." *Id.* at 842.

"Indifference 'may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care.'" *Jett*, 439 F.3d at 1096 (quoting *Estelle*, 429 U.S. at 1059). To establish a claim of deliberate indifference arising from a delay in providing care, a plaintiff must show that the delay was harmful. *See Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994); *McGuckin*, 974 F.2d at 1059; *Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990); *Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). In this regard, "[a] prisoner need not show his harm was substantial; however, such would provide additional support for the inmate's claim that the defendant was deliberately indifferent to his needs." *Jett*, 439 F.3d at 1096; *see also McGuckin*, 974 F.2d at 1060.

### 1. *Serious Medical Need*

Defendants do not dispute that Case has a serious medical need. Defs. Answers to FAC, Doc. 31 at 11, ¶ 104; Doc. 32 at 12, ¶ 104. The record reflects that Case sought frequent medical care for his neck and back pain and "the existence of chronic and substantial pain indicates that a prisoner's medical needs are serious[.]" *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014).

Having found the first prong is satisfied, the Court next examines defendants' response to Case's serious medical need.

### 2. *Deliberate Indifference*

There is no dispute that defendants were aware of Case's diagnosed condition and serious medical needs because it is documented in his medical and prison records showing treatment for his spinal condition. The dispute is whether, and when, Case required spinal surgery, and whether the defendants were deliberately indifferent to such need. A "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference." *Shapley v. Nevada Bd. of State Prison Com'rs*, 766 F.2d 404, 407 (9th Cir. 1985). Indeed, "[a] difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen in 'conscious disregard of an excessive risk to [the prisoner's] health.'" *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004). The Court will address each defendant in turn.

### a. *Defendant Johnson*

Defendant Johnson contends she was not deliberately indifferent to Case's medical needs but instead exercised her clinical judgment and medical expertise to make medically reasonable treatment decisions, based on her observations and assessments of Case and her review of his medical history. *See, e.g.*, Johnson Decl. ¶ 6.

Johnson's progress notes document her medical findings in her initial interactions with Case in April and May 2018. *See* Johnson Decl. ¶¶ 8–11 & Ex. A at 12–19. Those records show that Johnson promptly requested a CT scan for Case. Johnson submitted Case's request for a CT scan following his May 3, 2018 appointment with her, but it was cancelled by her supervisor, defendant Longia, a few days later. Johnson Decl. ¶¶ 9–11 & Ex. A at 16, 19; Longia Decl. ¶ 6 & Ex. A at 9. Longia's decision to cancel the CT scan request pending review of the most recent

imaging of Case's neck does not establish deliberate indifference, and, in any event, cannot be attributed to Johnson. *See Estelle*, 429 U.S. at 107 (A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). In addition, after May 21, 2018, Johnson did not treat or evaluate Case for another year. To the extent Case claims the CT scan was further delayed on account of Johnson's assumption that he had prior CT scans in the records system, such an assumption does not rise to level of deliberate indifference necessary to establish a constitutional deprivation under the Eighth Amendment. *Toguchi*, 391 F.3d at 1060 (9th Cir. 2004).[9] The desired CT scan was subsequently ordered by a different provider on December 4, 2018, approved by defendant Longia the next day, and conducted at an outside facility on December 27, 2018. DUF ¶ 21. Case does create a dispute of material fact regarding Johnson's treatment of him from April to May 2018.

A year later, on May 6, 2019, Case again met with Johnson to discuss specialist Dr. Senegor's recommendation for neurosurgery. By this point, Case had seen Dr. Senegor three times—on December 3, 2018; March 4, 2019; and April 22, 2019 (DUF ¶¶ 20, 23, 25)—and the specialist recommended that Case receive cervical spine surgery. *Id.* Dr. Senegor noted in each report summarizing the medical visit that Case's problems have been going on for "approximately five years" after he was involved in a significant car accident at the time of his arrest when "he hit a wall driving 60 miles per hour." *Id.*

The evidence shows that in May 2019, Johnson submitted a request for approval of the surgery to the SMART committee. *See* Johnson Decl., Ex. A at 20–24. However, the SMART committee denied the surgery on June 19, 2019. Fernandez Decl. Ex. A at 21. The SMART committee's rationale was "Limited exam on 4/22/19 by Neuros[urgeon]; [Bilateral upper extremities and bilateral lower extremities] strength are good; same exam 12/3/18 and 3/2/19

---

[9] In his first amended complaint, which was not verified, Case contends that a prior CT scan did not exist and that defendants' explanation was merely pretextual. FAC ¶¶ 36–37. An unverified complaint cannot be used as evidence in opposition to a motion for summary judgment. *Moran*, 447 F.3d at 759 & n.16. In his deposition, Case contends that he provided Johnson with copies of his medical records, and he asserts that she admitted she could not find any prior CT imaging in the computer system. Case Dep. 37:10–38:16. Even if true, this does not establish that Johnson's actions contributed to the denial of her May 3, 2018 request for a CT scan for Case.

15

Impact on ADLs is not mentioned." *Id.* Johnson thereafter continued to treat Case at VSP only until September 20, 2019. *Id.* at ¶ 22.

Drawing all inferences in favor of Case, Johnson is entitled to summary judgment. The evidence shows that, in the few months she treated Case, Johnson acted promptly to request a CT scan, submitted a request for surgery to the SMART committee, and otherwise treated Case's medical needs. Case does not show that Johnson's actions contributed to unnecessary delay of his surgery or that she falsified any medical records. Rather, any delay in Case's surgery was due to the SMART committee's June 2019 denial, based on the findings from Dr. Senegor's exam, rather than any decision or recommendation by Johnson. In addition, defendants' expert identified "well documented" "discrepanc[ies] between [Case's] complaints, physical exam, and imaging studies," and concluded that "Mr. Case's own non-cooperative, confrontational and manipulative behavior, along with the discrepancies between his complaints and objective observations by his clinicians, significantly contributed to the delay in obtaining approval for the surgery." Kuchinsky Decl. ¶ 5, Ex. B at 65–66.[10]

Taking all inferences in favor of Case, the evidence would not support a finding that Johnson was deliberately indifferent to Case's serious medical needs. Therefore, summary judgment is GRANTED as to the claims against Johnson.

### b. Defendant Gu

The evidence shows that Gu also acted promptly to treat Case's medical needs and that Case simply disagreed with Gu's medical judgment. For example, at Case's first appointment with him, Gu documents that he "extensively reviewed previous p[rimary]c[are]p[rovider] note. [P]t has complained neck pain long times. . . . if medically indicated, CT will be considered." Doc. 41-5 at 13. At that same visit, Gu ordered an x-ray and request for an EGD. *Id.* On September 12, 2018, when he learned that Case could not complete the EGD at VSP due to stiffness in his neck, Gu promptly requested an off-site EGD, which was approved. *Id.* at 19. On

---

[10] The undisputed medical records show that Case was diagnosed with "[G]eneral patient noncompliance" in his initial interactions with defendant Johnson through May 21, 2018. Doc. 41-6 at 17. Thereafter, he was diagnosed with borderline personality disorder beginning in July 2018. Doc. 41-5 at 12.

16

October 5, 2018, a non-CDCR physician, Dr. Jajodia, performed an EGD on Case under anesthesia at an outside facility, and in a letter addressed to the "C[hief]M[edical]O[fficer]" at Valley State Prison, the physician summarized his findings and treatment plan and noted, "Pt needs to see Orthopedic Surgeon for his Cervical Spine arthritis."  Doc. 81 at 48–51. Immediately after receipt of that letter, an interdisciplinary treatment team convened on October 8, 2018 to discuss Case's care and ultimately recommended referring him for a neurosurgeon evaluation before ordering a CT scan of his spine.  DUF ¶ 19.

In early December 2018, Case first saw Dr. Senegor, who recommended that Case receive a CT scan.  DUF ¶ 20.  Gu requested the CT scan the very next day.  DUF ¶ 21.  Case does not establish a dispute of material fact as to whether Gu's treatment decisions were medically reasonable or whether Gu unreasonably delayed taking action.

Case's grievances concerning Gu's interactions with him, and concerning Case's desire to see a spine surgeon, do not create a genuine dispute of material fact as to the reasonableness of Gu's medical care.  For example, Case's grievance filed on December 7, 2018 alleges Gu "kicked me out of visit for simply taking notes."  Doc. 81 at 167–68.  An institutional level response dated December 26, 2018 denied Case's grievance alleging that Gu disregarded "multiple medical issues."  *Id.* at 158.  On January 3, 2019, only a few days before his final visit with defendant Gu on January 7, 2019, Case contended, "I have not received any care or appropriate measures to provide any relief of my now extremely severe pain when both upright or lying down."  *Id.* at 177.  However, the medical records establish that Case received extensive care by Gu for treatment for his serious medical needs and that, when referral was necessary to see an outside specialist, Gu promptly made the referrals to outside specialists and to the SMART committee. Nor has Case provided expert testimony to rebut Gu's treatment decisions.

Taking all inferences in favor of Case, the evidence would not support a finding that Gu was deliberately indifferent to Case's serious medical needs.  Accordingly, summary judgment is GRANTED as to the claims against defendant Gu.

17

### c. *Defendant Longia*

Defendant Longia is also entitled to summary judgment. The record shows that Longia timely reviewed and processed requests for specialty care, including diagnostic imaging and surgical procedures, from individual medical providers. *See generally* Longia Decl. ¶ 2, Ex. A (Doc. 41-7). Longia properly handled Case's grievances regarding the quality of the medical treatment he received. *Id.* ¶ 12, Ex. A at 21. Longia also communicated with Dr. Senegor, Case's neurosurgeon, and Case's mother about his care. *Id.* ¶ 16, Ex. A at 26–27. Longia's decision to cancel the CT scan for review of the most recent imaging of Case's neck does not amount to deliberate indifference. *See Estelle*, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment."). Longia's treatment decisions and the evidence would not support a finding that Longia was deliberately indifferent to Case's serious medical needs. Longia is therefore also entitled to summary judgment.

Accordingly, the motion for summary judgment is GRANTED as to Longia and the claims against him are dismissed with prejudice.

### d. *Defendants Moseley and Fisher*

"Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of respondeat superior." *Snow*, 681 F.3d at 989 (citation omitted). Accordingly, the issue is whether defendant Moseley, the associate director of CDCR's Office of Appeals, was himself deliberately indifferent to Case's serious medical needs.

As to defendant Moseley, Case contends that he "signed off on plaintiff's appeals for protection from fraudulent reporting of 'occurrences' in the medical files from state staff misconduct which requested audio and video footage." Doc. 81 at 210, ¶ 35. In his opposition, however, he provides only a single decision from the Office of Appeals bearing Moseley's signature and that decision does not address any medical issue and briefly mentions "credit earning." Doc. 81 at 196–97. In his declaration, Moseley verifies that he conducted a search of the Office of Appeals' system to identify any healthcare appeals that he may have handled and identified only three such appeals. Moseley Decl. ¶¶ 11–12. A review of the exhibits provided

18

1  show that none involve requests for spinal surgery, CT scans, or other treatment relevant to this
2  case. *See generally* Doc. 41-8, Exs. 3–5. As Case has not provided any evidence to create a
3  dispute of material fact as to this issue, there is no basis on which a jury could find that Moseley
4  was involved in Case's medical care, let alone deliberately indifferent to it. *See Hunt v. Dental*
5  *Dept.*, 865 F.2d 198, 200 (9th Cir. 1989) (holding that prison administrators who "played [no]
6  role in denying [the prisoner] medical care . . . cannot be held vicariously liable for the fault of
7  [medical] personnel at [the prison]."). Moseley is accordingly entitled to summary judgment.

8  As to defendant Fisher, Case asserts that his attorney sent Fisher a letter on April 8, 2019
9  apprising prison officials of his need for spinal surgery. Doc. 81 at 211, ¶ 46. A review of the
10 letter in Case's opposition indicates that it was addressed to the attention of several prison
11 officials, including Fisher. Doc. 81 at 26–32. However, Case has not identified any evidence that
12 Fisher participated in his medical care or the approval process for such care. The record indicates
13 that Fisher did not personally review or address this letter, which Fisher states would have been
14 forwarded to the CEO of VSP, and that Fisher did not participate in any medical decision-making
15 involving Case. Fisher Decl. ¶¶ 8-9; *see Hunt*, 865 F.2d at 200. Accordingly, Fisher is likewise
16 entitled to summary judgment.[11]

### IV.   CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment, Doc. 41, is GRANTED in full. The claims against Johnson, Gu, Longia, Fisher, and Moseley are dismissed with prejudice and the Clerk of Court is directed to CLOSE this case.

IT IS SO ORDERED.

Dated:   August 14, 2025

UNITED STATES DISTRICT JUDGE

---

[11] Because the evidence shows that none of the defendants were deliberately indifferent to Case's medical needs, there is no constitutional violation. Therefore, the Court need not consider the second prong of the qualified immunity analysis: whether the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 230–32 (2009).